10. **Steven**, age 57, resides in North Woodmere, New York and is the owner of cabinetry business in Valley Stream, New York.

11. **Topal**, age 60, shares a home in Mamaroneck, New York with Marc. Topal is employed as a property manager for Phoenix Capital Partners, a real estate development company based in Purchase, New York.

## RELEVANT ENTITIES

12. **NBTY** is a manufacturer of vitamins and nutritional supplements that is headquartered in Ronkonkoma, New York. On July 15, 2010, NBTY and Carlyle announced that they had reached an agreement for Carlyle to purchase all of the shares of NBTY for $55 per share. On October 1, 2010, Carlyle and NBTY completed the merger. Prior to the acquisition by Carlyle, NBTY's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its common stock traded on the New York Stock Exchange.

13. **Carlyle** is a private equity firm based in Washington, D.C. Carlyle originates, structures, and acts as an equity investor in management-led buyouts, strategic minority equity investments, equity private placements, and growth capital financings.

## FACTS

**A.   NBTY's Insider Trading Policies**

14. In May 2002, NBTY announced its official policy regarding insider trading. The policy applied to all "accounting, administrative, supervisory and management" employees as well as to the board of directors. The policy prohibited covered employees and directors who are aware of material nonpublic information relating to the Company from buying or selling NBTY securities (except pursuant to a

pre-approved Rule 10b5-1 plan). The policy also prohibited the passing of material nonpublic information to "others outside the Company, including family and friends."

15.     The policy defined "material information" as "any information that a reasonable investor would consider important in making a decision to buy, hold, or sell securities. Any information that could be expected to affect the Company's stock price, whether it is positive or negative, should be considered material." The policy provided examples of material information, which included information regarding "[a] pending or proposed merger, acquisition or tender offer."

16.     As a member of the NBTY board, Glenn signed a certification acknowledging that he had read and understood the company's insider trading policy and would "continue to comply with the Statement of Policy for as long as I am subject to the Policy."

### B.     Carlyle's Non-Public Merger Discussions with NBTY and Glenn's Receipt of Material Non-Public Information

17.     On or about April 22, 2010, a managing director at Carlyle contacted the President and CFO of NBTY to discuss Carlyle potentially acquiring NBTY.

18.     On May 11, 2010, Carlyle personnel met for several hours with Executive A, NBTY's President and CFO, as well as with Executive B, NBTY's CEO, to discuss the potential acquisition.

19.     On the morning of May 21, 2010, Glenn attended a regularly scheduled board meeting of NBTY at the company's offices. During the meeting, NBTY management informed the board of directors of the approach by Carlyle. The board decided to retain Bank of America Merrill Lynch ("BofA") as its financial advisor and authorized management and BofA to further explore the transaction with Carlyle and to

contact a limited number of third parties to see if those parties would be interested in acquiring NBTY.

20. During the meeting, Executive B stressed maintaining the confidentiality of the discussions with Carlyle, and the board specifically determined that in order to maintain confidentiality, none of the interested parties (including Carlyle) would be permitted to discuss the transaction with any potential source of debt financing for the deal. The May 21 board meeting ended at approximately 11:30 a.m.

21. On the afternoon of June 4, 2010, Glenn attended a telephonic board meeting to discuss the status of negotiations with Carlyle and other potential bidders. During that meeting, the board authorized BofA to provide additional financial information to all potential bidders and to request that written indications of interest by submitted by June 14, 2010. Glenn called in to this meeting from his cell phone and, based on his phone records, remained on the call for 19 minutes.

22. On June 16, 2010, Glenn attended another telephonic board meeting to discuss the merger negotiations. At this meeting, the board authorized BofA to permit bidders to contact sources of debt financing. Glenn called into the meeting at 10:58 a.m. and remained on the call until 12:55 p.m.

23. On June 18, 2010, Glenn placed a 15-minute call to the same teleconferencing access number that he used to attend the previous telephonic board meetings (although this conference call does not appear to have been an official board meeting).

24. Glenn attended additional telephonic board meetings on June 24, July 6, July 12, and July 14, 2010.